NATIONAL ELECTRIC SIGNALING CO. et al. v. TELEFUNKEN WIRELESS TELEGRAPH CO. OF THE UNITED STATES.

(District Court, S. D. New York. June 12, 1913.)

1. PATENTS (§ 328*) — VALIDITY — INFRINGEMENT — APPARATUS FOR WIRELESS TELEGRAPHY.

The Fessenden patent, No. 706,736, for apparatus for wireless telegraphy, as limited by the prior art, *held* not infringed.

2. WORDS AND PHRASES—"TUNE"—"TUNING."

A receiving system of a wireless telegraph is in "tune" if the period of the induced pulses is exactly the same as the interval between the waves themselves, so that the return of the first pulse to the receiving antenna and from the other end would be exactly synchronous with the reception of the second wave by the antenna itself, and the controlling of this result by varying inductance and the capacity of the receiving system so as to be exactly the same as that of the transmitter is "tuning."

In. Equity. Suit by the National Electric Signaling Company and others against the Telefunken Wireless Telegraph Company of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

United States for infringement of letters patent No. 706,736 for apparatus for wireless telegraphy granted to R. A. Fessenden, August 12, 1902. On final hearing. Decree for defendant.

See, also, 194 Fed. 893; United Wireless Tel. Co. v. National Electric Signaling Co., 117 C. C. A. 262, 198 Fed. 386, 119 C. C. A. 71, 200 Fed. 591.

F. W. H. Clay, of Pittsburgh, Pa., for complainants.

Hector T. Fenton, of Philadelphia, Pa., for defendant.

HAND, District Judge. I group the 14 claims here in suit into three classes: First, the claims for the direct transformation of the current into motion, 1, 4, 22, 23, and 34; second, the claims for "tuning," 6, 10, 13, 28, 29, 30, 33 and 35; and, third, claim 15, the "low-resistance" claim, with which also belong claims 22 and 23. Some of the "tuning" claims are also claims for direct transformation, but they need no separate consideration from the direct transformation claims themselves.

[1] First, I will consider the "transformation" claims, some of which I quite agree, as mere matter of wording cover the defendant's apparatus. A question may be raised about claims 22 and 23, which are "low-resistance" claims like claim 15, but all are broadly based upon the fundamental idea I have mentioned. It is perhaps a little strange that every claim concludes with the phrase "substantially as set forth" except Nos. 31, 32, 33, 34, and 35. While these words have as matter of law no real effect at all upon the claim, still they sometimes signify the draughtsman's sense that his terms, while very broad, are to be read upon the actual disclosure made. The question in this case is whether, in spite of their broad language, the claims must not be limited in interpretation to the disclosure actually set forth, or to some derivative of it which shall owe some suggestion to the disclosure. If the claims require no such limitation, then Fessenden can claim a valid monopoly upon every wireless receiver which directly transforms the energy of the wave-train into the energy of motion, that is, without the intervention of some relay battery, and the defendant is certainly an infringer.

At the outset it will be clearest to see how much similarity there is between the two devices and how much difference. Each system has a completely closed receiving wire from antenna to ground, including the detecting devices. This applies as well when the detecting apparatus is in the secondary of a transformer as when it is in conductively connected series. In each the only energy which moves the object that sensibly affects the eye or ear is the oscillatory current; in short, the electromotive force is transformed into motion. With this it seems to me the resemblance absolutely stops, because neither is the current operative in the same way, nor is the apparatus in the least alike, nor does one give the faintest clue to the discovery of the other.

To justify these assertions I had best take up the operation of each. Fessenden makes in his receiving wire two loops, between which the oscillating pulses create a magnetic field of one sign when the oscillation moves in one way, and of another when it moves in the opposite. Within this field he hangs a metal ring by a fine filament, which interposes but the slightest impediment to any torque which the ring may re-

.ceive. The magnetic field between the loops or coils sets up voltages in the ring, which in turn create in it a current. If the ring be hung at a given angle to the coils, the interaction of the field with the current in the ring, as the current oscillates, creates a constant torque upon the ring, enough to overcome its inertia. Mr. Clay says that the result is a rectification of the magnetic field analogous to the rectification of the current itself by defendant's "rectifier," but I can find no evidence of the sort. The explanation I have given is Fessenden's own explanation in his paper of November 28, 1899, and I find nothing further in the testimony of either Stone or Kennelly. It is true that Stone describes the torque as the product of the reaction of the two fields, one produced by the current in the coils, and the other produced by the induced current in the ring; but I think it can make no difference whether field of the coils operates upon an induced current or upon an induced field. In either case there is no mention of rectification of the field, and the phenomenon is nowhere explained. I cannot assume that the field is changed in character, and I do not, of course, understand the phenomenon, which is confessedly complicated.

In the defendant's apparatus there is interposed in the circuit which receives the oscillating current a substance of very high resistance indeed, called the "detector." The functional characteristic of this mechanism, whose structure I need not explain in detail, is that, while it offers a high resistance to oscillations in both directions, it offers more to those in one than to those in the other. As a consequence, a greater quantity of current passes through the detector when the oscillation is in one direction than when it is in the other, and indeed the part which does not pass through is turned back so as to flow in the opposite direction. There is thus created in an ingeniously associated circuit containing a telephone a series of current differentials always in one direction, which are operatively precisely the equivalent of a direct current in the circuit itself, and which can therefore be made to energize the coils of the telephone magnet, thus making the diaphragm respond.

It seems clear to me from this explanation that the defendant's method of operation owes nothing to Fessenden. It proceeds by modifying the current itself, turning back a part of it, and sending it the other way. It creates out of an oscillating current a direct current, and, after it has done that, it interposes the very obvious appliance for detecting a current, the telephone. But Fessenden 'did not modify the current at all; he is not even shown to have modified the magnetic fields. He did take advantage of the reaction of these fields upon the ring to move the ring, but it was that motion which was the first unidirectional movement of either current or mass. The defendant, it is true, for each whole wave-train produces a movement in the diaphragm of the telephone, but even this is not detectable by the senses, because it is only the vibration of the diaphragm produced by a succession of wave-trains which gives the note that the ear receives. Perhaps it would, however, be fair to allow that in this latter respect the two are analogous, for the succession of wave-trains amplifies the motion of Fessenden's ring, and in the microphonic adaptation pro-

duces the telephone note by variations in the battery current. Nevertheless, the fact remains that the apparatus and its operation is quite different in each case.

Furthermore, when we consider what the defendant owed to Fessenden, we see that it was nothing but the idea of transforming the energy of the oscillating current into motion. All that Fessenden did was to apply to the detection of these particular oscillations a detector theretofore known for·alternating currents generally, which, as Dr. Kennelly concedes, "was recognized at the date of the appearance of Northrup's article" as "capable of indicating the presence of Hertzian waves." He discovered nothing about the current or its nature; he discovered nothing about the galvanometer which he used. What he did do was to make a very handy adaptation of Northrup's galvanometer to thi. particular instance, and no one ought, I think, to question his title to a patent for just what he did. The defendant, however, made no use of anything shown in that patent at all; this galvanometer was perfectly useless in helping his discovery, because he was seeking to change the current itself, after which the path was open to any electrician; it was only the detection of a very minute direct current of electricity.

Therefore the question comes down to this: Granting that the defendant has borrowed not a thing in detail from Fessenden and owes no suggestion whatever in method or device, is it enough that each transforms the electric energy into motion? That any one should claim such an idea as original merely as such would à priori seem unlikely, for the idea was a scientific commonplace long before Fessenden made his invention, or indeed was even born, and it was a known way to measure electricity, as in the electroscope itself. Furthermore, this very form of transformation was actually practiced experimentally by Hertz, as described, as early as 1891 in Wiedmann's Annalen, No. 42, page 407. The translation appears as chapter 7 of Hertz's book, "Electric Waves," and is entitled "Mechanical Action of Electric Waves in Wires." Hertz used two forms of apparatus for measuring the oscillations by the movement of suspended bodies. One of these was a horizontal cylinder hung in a plane at 45 degrees to the plane of the wire which received the oscillation; and the other was an aluminum ring. In view of the fact that the receiving wire was not itself coiled, there may have been some difference in operation between this and Fessenden's galvanometer, as to which I am not competent to say; but certainly the following language seems to describe the present theory of the operation admirably (page 192):

"The rapidly alternating magnetic oscillation must induce in the closed hoop a current alternating rhythmically with it, and the reaction between these causes the deflection of the loop."

I am not in the least concerned here with whether this was exactly the same thing as what Fessenden afterwards discovered, because no one wishes to declare his patent invalid, but only to ascertain its limits. Nor does it make any difference whether Hertz was here dealing with the effects of magnetic induction without knowing it. He supposed in any case that he was measuring the oscillations of radiated waves, and

whether his experiments misled him as to the actual phenomena he was observing, he at least gathered from them an exactly accurate understanding of the action of radiated waves, and discovered, if it needed a discoverer at all, the fact that they could in just this way produce motion.

Next the Northrup device was in substance the very identical instrument afterwards used by Fessenden, but used here to detect the results of magnetic induction. That the step from this use of the Thomson galvanometer to Fessenden's did not take time, or inventive genius, appears from the immediate suggestion by the editor of the magazine in which the article appeared. Dr. Kennelly, in the phrase I have quoted just above, admits that the application of the instrument was at once recognized. As for the damping magnet of Northrup, I may pass it over as a mere detail of organization. The phenomena of magnetic induction themselves are no doubt in some respects quite different from those of radiated ether waves, and, as before, I have no disposition to declare these experiments of Northrup good anticipations of Fessenden's disclosures, which were the first practical application of them to radiated waves, yet the fact certainly remains that all Fessenden did was to adapt Northrup's galvanometer to a new use, and that also to a use which was in a closely kindred art.

In the face of this showing, it seems to me extravagant to claim this as a great pioneer invention. Let us see what the inventor himself thought of it after he had discovered it. It is true that he claimed broadly, though, as I have noted, he somewhat significantly added a reference to the disclosure even in the claims; but he stated the object of his invention (page 1, lines 33–41), and then he said that the "object" of his invention was to induce currents in a secondary ring and thus produce motion. In the summer of 1899, he obviously had no idea of this mere idea of such a transformation as itself an epoch making invention, the mere conception of which was revolutionary, although he now asserts that it was wholly perfected at that time. In his first publication, July 29th, he was still speaking of improvements in coherers. On August 12th he says that for some work the coherer is not necessary at all, but one may use his own device. "All these methods, though tried on a small scale, seem to be improvements." In his paper before the Institute, he describes only a "nice galvanometer to work with," not mentioning his discovery of the direct transformation of energy as a new way of facing the difficulty. Of course, I do not mean to complain that an inventor should be modest at the outset, but I do say that no one reading these statements intelligently can fail to miss all indication that he thought the fundamental idea a new discovery. I am quite sure that such a claim would have greatly surprised his audience. Clearly he regarded his devices as good alternatives to those in use, as they admitted quantitative measurement which the others did not.

As to the Tietz bolometer, it hardly seems to me relevant broadly, because the actual detection of the waves is made by means of a Wheatstone Bridge, and the recording galvanometer operates by means of a voltaic battery. A very slight current in one arm of the bridge,

if it be a very fine wire, will cause it to become heated and so change its resistance. This upsets the balance of the bridge, and a galvanometer records the battery flow. However, I agree that it was a device within claim 34. Whether it was a valid anticipation or not, I do not think it necessary to decide. It is true that these seem to have been experiments only, but then Fessenden's actual disclosure has had almost no practical application. At least, this gave quantitative responses and did not raise the question which always seems to have existed in the case of coherers, whether a real resonance was possible.

We must remember that the patent law gives no domination merely to the first comer, nor any claim by right of occupation only. A patent is designed only to protect the inventor from those who would use his ideas and who really owe him something. The mere fact that he may be the first to embody an abstract principle does not give him the right to monopolize it, unless the mere conception is new and requires his inventive originality, which is not the case here. It is true that the mere discovery of a problem may require a touch of genius, but this problem was well known. Hertz at the very outset had grasped it, and had given an answer almost identical with this. Fessenden's claim now seems to me to be as though the Wright brothers who assert that they were the first to fly, should claim a patent on all flying machines, regardless of whether or not they use the warping of the planes. I cannot see that the art owes him anything but a handy device for testing out wireless apparatus, which is the only commercial use it has had.

The next question is of the "tuning" claims, to understand which it is necessary to describe more fully the phenomena of the waves. As has been said, these come in the form of oscillations; each being a half cycle of a wave. When the spark discharges across the terminals, it sets up in the transmitter a current which passes first to one end of the circuit and then surges back to the other. A properly grounded antenna may be compared with a closed circuit having a condenser, in which the antenna proper is on one capacity and the earth the other. Hertz, who did not ground his transmitter but had two areas of relatively large capacity, recognized this, and regarded the ether separating the capacities as the analogue of the dielectic of a true condenser. This conception is necessary to an understanding of the kind of "tuning" here in question. When the pulses reach the antenna, it throws off into the ether disturbances which are true waves, similar to light waves, or the air waves of sound. If the pulses can rush back through the circuit to earth and then back to the antenna, a second wave will be thrown off, and the capacity of the system to send off these "echo" waves as it were determines the persistence of the wave-train. If the "echo" pulses are feeble, and the greater part of the energy goes off at the first pulse, the train is said to be quickly "damped" and comes to the receiver in the form of a mere "splash" in the ether. If, on the other hand, the system can conserve a large part of the energy, it will be radiated in successive waves, whose rate of decrease will be much less. Now, the first kind of "tuning" was practically developed by Sir Oliver Lodge for the purpose of what he called "selectivity." By this he meant that the oscillations should be prolonged as much as

possible; a less proportion of the spark's energy being thrown off at each pulse, and the subsequent pulses being of greater intensity and the wave-train of greater persistence. Moreover, as the period of the pulses in the transmitter was of known frequency, the period of the waves making up the train was fixed and constant. When the first wave reached the receiver, it set up voltages in it which resulted in currents passing through that system.

[2] If the period of the induced pulses in that system was exactly the same as the interval between the waves themselves, the consequence would be that the return of the first pulse to the receiving antenna and from the other end, whether it was plate or ground, would be exactly synchronous with the reception of the second wave by the antenna itself. When a receiving system was in "tune" with the transmitter, this occurred, and this result could be controlled by varying the inductance and the capacity of the receiving system so as to be exactly the same as that of the transmitter. Now the result of this would be, thought Sir Oliver Lodge, that the second wave would be amplified by the "echo" of the first, and so more of the energy of the wave-train could be developed in the succession of current pulses oscillating in the receiving antenna. This cumulation of energy would increase the electrostatic charges in the terminal plates and would finally "spit off," so that with a given total amount of energy received from the train the coherer would "break down" more readily than if only the first wave of that train was used. Since, however, this depended wholly upon the synchronism of the oscillations in the receiving circuit with the periodicity of the waves themselves, a receiving circuit not in "tune," that is, not constructed with precisely the same inductance and capacity, would not respond. In such a receiver the "echo" pulse would reach the top of the antenna at the time, for instance, when the trough of the next wave was reaching it, and would therefore by so much neutralize the energy of the second wave itself. The resulting second oscillation would not go to increase the potential at the terminal plates, and so to break down the coherer.

It followed from this very beautiful conception that only those receivers would respond to a transmitter which were attuned to it. At one time Sir Oliver Lodge seems to have supposed that a tuned transmitter was more limited in distance, because the first great "splash" will have a greater radiating power; but in his British patent 11,575, of 1897, he seems to have corrected that opinion, because he says at the end of his provisional specification:

"Although the radiation becomes less powerful, the total number of swings is so much increased that it may be made as ultimately effective at a distance as a single powerful swing."

This is perhaps not strictly relevant here, except that it seems to contradict the assertion of the complainant, that while coherers were in use, it was only the first pulse or "whip-crack," to use Sir Oliver Lodge's phrase, which counts. Indeed, I cannot understand how his theory could be borne out at all except upon the assumption that there is a summation of the pulses somewhere, he thought at the terminal

plates, cumulatively building up a potential sufficient to break down the coherer. ·

Such was the "tuning" of Sir Oliver Lodge; but there seems to have been some doubt whether with a coherer it ever operated at all. At least, I understand Dr. Kennelly to believe that if there was any "tuning" it was of a very modified kind to that now possible when the coherer is taken out of the circuit. I do not think, however, that Pupin is to be so understood; while he said that nobody had succeeded in tuning a receiving circuit, that was because no one had gotten an undamped train of waves or a close enough succession of sparks to "swell up" in the receiver, not because you could not accumulate what you had. Stone and Pierce both insist that there is not the slightest à priori reason to doubt that at the ends of the coherer the electrostatic charges may accumulate as a result of the striking of the successive pulses against the coherer, and that the final breaking down of the coherer may not be due to a real accumulation of potential. Of course, I have no means of judging such a question as this and shall only proceed upon the undoubted fact that a very great scientist, Sir Oliver Lodge, certainly believed that he did procure an integration of the energy of the whole wave-train which broke down the coherer. His patents are meaningless upon the assumption that only the first great pulse is operative and his expression quoted referred only to distant telegraphy. As I have shown, he seems to have modified that judgment by 1897.

Now in circuits such as these antennæ there is considerable loss of current due to the resistance in the circuit itself, the energy disappearing in the heating of the wires or capacity areas; and, especially in the case of the receiver, where the energy to be detected is excessively small, it is of prime consequence to avoid such losses. To do this both Lodge and Marconi introduced a local circuit about the coherers, the purpose of which was to divert into it as great a part as possible of the energy which came down the antenna. In this local circuit they placed a condenser and an inductance coil. As I have already said, the antenna and the ground are in fact the opposite plates of a condenser, and if the condenser and the inductance coil of the local circuit are attuned to the antenna circuit, precisely as the antenna circuit is attuned to the transmitter, then so much of the received pulses as is diverted into the local circuit will have the same period therein from one plate to the other of the condenser as the period of the pulses in the antenna circuit itself. That period, as we saw, was the exact period of the wave-train, so that it has become now a commonplace of wireless telegraphy to tune in harmony, the transmitter, the receiving antenna, and the local receiving circuit. There is also a local circuit in the transmitter, inserted for the same reason, and this must also be in tune. Hence if when the first wave comes down the greater part of it begins to oscillate in the local receiving circuit, the second wave will enter that point in the local circuit at exactly the same phase of its cycle, as the "echo" of the first wave is in. Thus at that point and at that instant, there is obtained precisely the same integration, or summation, of pulses in the local circuit as in the antenna; but the resistance losses are avoided which .

would exist if the whole of the pulses had to pass through the antenna circuit.

The complainant's position is not that he was the first to discover this kind of tuning of the local circuit, which, he says, was well-known before (so far as tuning was possible with a coherer), but that he was the first to add to a receiving circuit a local closed tuned circuit, and that this appeared from his original specification and claim. The answer is that, regardless of whether this would be a good invention or not, it was an interjected idea. In his original claim 3 he mentioned a condenser in shunt with the coils 7, 7 and the associated ring 8, without however any inductance coil, and that is the only mention in the claims of the condensers at all. Not a word appears in either specifications or claims of "tuning." In the specifications he says that the condensers indicated in the diagrams may be put in shunt with transmitter or receiver, and that is his only mention of them. Nowhere does he either describe or show in diagram an induction coil. The first action in the Patent Office rejected all claims and required the applicant to state the purpose of the condensers. Thereupon he directed the deletion of the condenser in the transmitter, and amended his specifications by saying that the condenser in the receiver was to avoid resistance losses, setting forth in detail how the proportion of the current in the main circuit could be reduced so that the maximum might flow in the local circuit. The reason for this result I do not understand, but it is irrelevant here. The patent was actually allowed once on this showing and, indeed, was reopened again, still showing nothing of tuning. In June, 1902, two and one-half years after the original application, the specifications were amended so as to include the tuning of the closed circuit, and 23 new claims were added claiming tuning in a great variety of forms. Subsequently other claims were added, which were, however, not a departure, if the amendments themselves were proper.

Two quite separate questions arise: First, whether Fessenden in 1899 understood and expressed the tuning of the local circuit; second, whether, if he did, he had any idea of claiming it originally. As to his knowledge, the question must remain in doubt. How much he or any one else knew is not capable of ascertainment except by what he said, and neither in his patent, nor anywhere else, did he say anything in the least resembling it. Of course, it may have been obvious as Kennelly says, but in patent causes we are chary of too ready an assumption of the obvious. Every one concedes that Stone is a very expert person and one of the best men in the art, yet it was not so obvious but that he put an untuned condenser across a coherer in a local circuit. It may be that the complainant is right that a tuned receiving circuit was unknown while the coherer was used; but, if so, it was all the more incumbent on Fessenden to point out that he had obtained a real tuning, for the first time possible, when the circuit was closed. Certainly that which he first did should not have been included in the obvious.

Fessenden during the summer and autumn of 1899 had written two or three times about his new apparatus and had never mentioned tuning. On August 12th he had shown a condenser in series with the coils and no local circuit, but did not give it any function. On September

16th, he had shown three forms, one with a condenser in shunt with the coils, but he described that as little as the condenser in series, and seemed to regard it as a mere alternative of arrangement. In his lecture he showed one form with a condenser in shunt which he says would avoid resistance losses, just as he afterwards said in the patent. Not a word in that lecture suggests that you should tune the local circuit. At that time his problem had not been worked out, and among the 12 points recapitulated were the effect of condensers in shunt with the receiver, but not a word about the tuning of the local circuit. Furthermore, I attach great importance to the amendment first made. Surely when he found that the examiner did not understand, he must have explained it if he understood it himself. Is it not too much to ask of us that we should now accept, as too obvious to require mention, what an expert in the Patent Office asked for an answer to? It was certainly no less obvious that the condenser was put in to avoid resistance losses than that it should be tuned after it was put in. Again, it is very significant that in his patent 727,325, which was based upon the separate tuning of different receiver circuits, he spoke freely of tuning and made it the very kernel of his invention. Is it not rather strange that if he knew its necessity here he did not mention it? Finally, it seems to me of prime consequence that nowhere did he put an inductance coil in his local circuit, though every one concedes that the variation of the inductance is as absolute a condition of tuning as the variation of the condenser. In short, he did not prescribe anywhere one essential part of a local tuned circuit. For that matter, he has never done that to this day. Mr. Clay says that Fessenden's trouble throughout has been that he assumed too much knowledge in his audiences. That may well be so, and, if it is, I am very sorry for it, but we cannot know what was in his mind if he did not speak it out; that is the misfortune of the taciturn.

It is, however, really irrelevant whether or not Fessenden understood the nature of his own condenser, for, even if he did, he did not make any claim to the combination, and that is all that counts. Whether he thought that it was not worth claiming, or whether he thought it was not patentable, makes not a particle of difference. A patent claim is a formal instrument, and its meaning depends upon its words, and not on the mind of the inventor. Nothing can be plainer than that claim 3 did not ask for a monopoly on a local tuned circuit, even if it was obvious that the apparatus contained in fact such a circuit. The claim must point out what the applicant regards as his monopoly, and there may be many things obvious enough from the specification which he does not claim. The complainant has argued as though it were enough to show that tuning were obvious from the specifications, but that is not half the story. Is it clear that he meant to claim that feature? It is clear that he did not; and, therefore, he could not afterwards change his mind. Perhaps the other applications in suit, filed during those two and one-half years, which resulted in tuning patents may not originally have had tuning features in them, no one knows; but presumably they did, if now valid, and Fessenden could not by an amendment antedate them. Besides, the rule as to amendments may

209 F.—55

have for its justification a protection to the intervening art, but it does not depend in its application upon a showing that there is such an art to be injuriously affected; it is enough that the applicant make some radical change of base. I have no doubt that he did in this case, and this disposes of the tuning claims in suit.

As to claim 15 for a low-resistance receiving mechanism, it is enough to say that the defendant's crystal detector has a resistance of 100,000 ohms, quite as much as the old coherer.

I have laid wholly out of this case the Hughes device on the assumption that Fessenden had succeeded in antedating it. As to that question I should hardly feel disposed to any doubt that he had in fact perfected his apparatus in May, 1899, were it not for his own contemporaneous expressions. For instance in November, 1899, he said:

"A few experiments were made in June, but the matter would have been dropped had it not been that my former assistant and present colleague, Prof. Kintner, * * * offered to help me, and * * * it has been found that it will be possible to carry the work to a successful conclusion."

On August 12th he says:

"My experiments seem to show that it (a coherer) is not really necessary."

In June, 1902, he swore:

"During the month of September, 1899, * * * he was engaged in making experiments in signaling by electromagnetic waves; that on or about September 15, 1899, he constructed and used an apparatus," etc.

Kintner supports him in the same words. Fessenden's own explanation of his language in these instances did not seem to me satisfactory. I must confess that, if I was forced to decide whether he had tested out his invention by actual reduction to satisfactory experiments before September, 1899, I should certainly think that he had not. I have no doubt, however, that he had proceeded far enough to give some instructions and diagrams to his attorney in July, 1899, and the diagrams must have been those in the patent. That he had therefore grasped the full conception of the patent by June, 1899, may perhaps be true, but I do not think it necessary to decide that question here.

I have considered this case as though it was one of first impression, because the complainant was so extremely solicitous to have it done. Quite regardless of the prior decision, I should not, I think, have felt any difficulty in deciding it as I have done. In any case there cannot be any question that, as I look at the facts, I ought not to hesitate for a moment to follow the decision of the Circuit Court of Appeals for the First Circuit. (198 Fed. 386, 117 C. C. A. 262). The suit appears to me to be an effort, natural and sincere enough, to raise what was a simple, and not very useful, contrivance into a great pioneer patent. Fessenden was indeed, the first inventor to patent commercially a directly transforming device. It so happened that the art through very different channels found other independent devices, the electrolytic, and now the crystal, detector which have superseded everything else. Hence it was natural for him to feel that he was the father of them all. He was nothing of the kind, but in this case an ingenious adapter

of the ideas of others to this field. Of course, it must be obvious that as to his other inventions I have nothing to say, and I am very glad to assume, as Mr. Clay assures me, that his contributions have been greater than those of any other man in this country.

The bill will be dismissed, with costs.