## HAZELTINE CORPORATION v. R. E. B. SERVICE CORPORATION.

### No. 7163.

District Court, E. D. New York.

Sept. 10, 1934.

Pennie, Davis, Marvin & Edmonds, of New York City (Willis H. Taylor, Jr., and Baldwin Guild, both of New York City, of counsel), for plaintiff.

Darby & Darby, of New York City (Samuel E. Darby, Jr., of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This action is brought for relief by injunction and money damages, for the alleged infringement of patent No. 1,879,863, issued to Harold A. Wheeler, assignor to Hazeltine Corporation, for volume control, granted September 27, 1932. Original application filed

July 7, 1927, serial No. 203,879, and in Great Britain July 3, 1928. Divided and this application filed November 13, 1930, serial No. 495,386.

This suit is based on claims 1, 5, 6, and 10 of the patent in suit.

The plaintiff, Hazeltine Corporation, is not a manufacturer, but is the owner of a number of patents, of which the patent in suit is one of one hundred and fifty seven, and its sole activity consists in granting licenses to manufacturers of radio apparatus under all of its patents.

The defendant is engaged in operating a small retail store in Flushing, Long Island, and regularly handles the Bosch and RCA-Victor radio receivers.

The United American Bosch Corporation, Colonial Radio Corporation, and RCA-Victor Corporation, the respective manufacturers of the three radio receivers alleged to infringe in this case, are not licensees of the plaintiff.

The three corporations last above named are all licensees of Radio Corporation of America, General Electric Company, American Telephone & Telegraph Company, Western Electric Company, and Westinghouse Electric & Manufacturing Company (and their respective related and associated companies), under all patents owned by each of them, and the radio receivers charged in this case to infringe were manufactured under such license.

All of the patents of the prior art in evidence in this case, to which I will hereinafter refer, are patents under which the three alleged infringing receivers are and were licensed, and this is true whether there was recited on each of them the numbers of all of said patents or only some of them.

A suit in equity (No. 6873) was brought by the same plaintiff in this court against the same defendant, prior to the commencement of the present action, complaining of the defendant's sale of one radio receiver manufactured by the Kolster Radio Company of Newark, N. J., and known as Kolster model K-130.

No other manufacturer or set was ever referred to at any time in that suit.

The Westinghouse Electric Supply Company, which was interested in the Kolster only, assured the defendant of reimbursement for any damages or costs which might be assessed in said suit against Kolster sets, the defendant defaulted after answer, and a decree was entered therein after inquest, containing the usual provisions as to validity of the patent and the infringement thereof of the said Kolster receiver model K-130.

The manufacturers of the Bosch, Colonial, and RCA-Victor sets have not involved themselves in the present suit.

In Hazeltine Corporation v. Benjamin Abrams et al., 7 F. Supp. 908, a suit brought in this court on claims 1, 5, 6, and 10 of the patent in suit, Judge Galston, in his opinion dated August 2, 1934, held the same to be invalid, claims 1, 5, and 6 for want of invention because of Affel patent, No. 1,574,780, Heising patent, No. 1,687,245, and Bjornson patent, No. 1,666,676, and claim 10 for want of invention because of Heising patent, No. 1,-687,245.

By reason of the decree on default in the former suit, the defendant cannot raise an issue as to the validity of the patent in suit, and in this suit the patent in suit must be treated as valid.

The defendant can and does raise the issue of infringement, and may seek to limit the construction of the claims in view of the prior art.

I find no support for plaintiff's claim of infringement in the granting of a preliminary injunction in this suit, as Judge Moscowitz, by his opinion, clearly shows that he believed there was no issue of infringement before him, while on this trial that issue has been fully litigated, and much evidence offered which was not before Judge Moscowitz.

Plaintiff offered evidence designed to show commercial success of the patent in suit.

Evidence of commercial success may, when the question of invention is a narrow one, lend weight in the determination of that question, but, inasmuch as the patent must be accepted as valid for this case, such evidence does not assist.

In any event the evidence of commercial success is not impressive, as the evidence does not furnish grounds for determining what success this patent may have had, disassociated from other patents owned by plaintiff.

The settlement by the Zenith Radio Corporation and its terms does not assist in determining the question of infringement in this suit, but in any event the $10,000 paid by that corporation was not merely in settlement of that suit, but in settlement of past infringement of all of the patents of the Hazeltine Corporation during the many years of the existence of the Zenith Radio Corporation.

We will therefore proceed to consider the three radio receivers of three different manufacturers, Bosch, Colonial, and RCA-Victor, confining the discussion to the question of infringement.

My findings are based on conflicting evidence, and, while I have considered the evidence, arguments, and briefs offered on behalf of both plaintiff and defendant, I find it neither necessary nor proper to discuss it all in detail.

The patent in suit is not a pioneer patent. The patent in suit relates to the radio art, and is directed to "automatic volume control," usually termed AVC. This has been defined by the Standardization Committee of the Institute of Radio Engineers, as "a self-acting device which maintains the output constant within relatively narrow limits, while the input voltage varies over a wide range."

Automatic volume control or AVC, and the fundamental principle thereof, viz. the utilization of a direct current potential from the output circuit of a device, to affect the input circuit of an associated amplifier, to thereby control the degree of amplification effected by the amplifier, has been known at least as early as 1921. See Affel patent, No. 1,574,-780, included in Exhibit B.

The drawings of the patent in suit, in Figs. 1, 3, and 7, show three radio frequency amplifier tubes arranged in series; the output circuit of the last amplifier tube being connected to the input circuit of a detector tube. This detector produces audio frequency currents. In each figure it consists of a triode (a three-electrode tube) having its two cold electrodes (the plate and grid) connected together so that the vacuum tube acts as a diode (a two-electrode tube). The detector tube in each instance is located between the radio frequency and audio frequency sections, and its output circuit passes on to the remainder of the system (shown as comprising audio frequency amplifier tubes and a loud speaker) the current that passes through it. In each instance, likewise, the output electrode and output circuit of the detector tube is the sole means by which the current, which ultimately reaches the loud speaker, is relayed to it. Likewise, in each of the figures the output electrode of the detector is also connected, as an automatic volume control, to the grid or control input electrode of one or more of the radio frequency amplifiers.

Figs. 4 and 6, the two remaining circuit figures of the patent, differ from Figs. 1, 3, and 7, principally in the type of detector that is employed.

Figs. 4 and 6 employ the conventional three-electrode detector, that is, a triode used as a triode, instead of using a triode connected as a diode.

In Fig. 6 the filaments of the vacuum are shown as connected in series, whereby the resistance of the filaments establishes a potential difference between the filament of the detector tube (and therefore the plate electrode thereof) and the filaments of the amplifier tubes which precede it.

Fig. 7 combines the features of Figs. 1 and 6, and shows a triode connected as a diode as the detector performing the double function of effecting automatic volume control and serving to relay the signal current to the succeeding stages of the system, and also the utilization of the series connected filaments to establish a potential difference between the cathode of the detector and that of the controlled amplifier.

Plaintiff confined the consideration of its expert Langley to Fig. 1 of the patent in suit, as being the only arrangement shown approximating the automatic volume control circuits of the three receivers alleged to infringe herein.

Plaintiff's expert Langley says that the invention of the Wheeler patent in suit consists of three following features or points:

First, an arrangement by which the anode of a detector tube is maintained normally negative relative to the cathodes of the amplifier tubes which it is desired to control.

Second, an arrangement by which the anode of that detector tube becomes increasingly negative as the strength of the amplified signal increases; and

Third, a direct current unipotential connection from the anode of the detector tube back to the control electrode of the amplifier tube.

In all of its argument plaintiff attempts to show infringement by applying these three points to the alleged infringing receivers, instead of comparing them in each instance directly with the claims of the patent in suit.

I do not believe that those three points exactly define the patentee's contribution over the prior art.

The first of the three points in which plaintiff's expert says the invention of the patent in suit consists does not seem to me to be described in the specification with respect to Fig. 1 of the patent in suit. The instances in which that feature or point was said by plaintiff's expert to be disclosed in the specification of the patent in suit, page

6, lines 66–72, line 79 on the same page, and line 115 on the same page, each and all refer to Fig. 6.

The only arrangement described by the specification of the patent for effecting the negative potential of the detector anode relative to the amplifier cathode (other than the utilization of a battery for that express purpose, an expedient with which we are not concerned) is that shown in Fig. 6; that is, connecting the filaments of the tubes in series so that the resistance of the filaments will effect a potential difference between them.

Plaintiff's expert says, and it is not disputed, that none of the receivers alleged to infringe herein employs this expedient.

The second point or feature so as above enumerated by plaintiff's expert was old in the art, as in all detectors the anodes or output electrodes become increasingly negative as the strength of received signals is increased. Plaintiff questions this statement, using Affel patent, No. 1,574,780, as an example, but I believe erroneously, because, as I understand it, volume can be as well controlled by the grid becoming increasingly positive, as by becoming increasingly negative with increased signal, and Affel shows both ways of effecting automatic volume control.

The third point or feature described by plaintiff's expert was old in the art, having been employed during the time that automatic volume control has been known, which antedated the patent in suit.

During the prosecution of the application for the patent in suit, the following prior art patents, all of which are directed to automatic volume control, were cited: Friis, No. 1,675,848; Affel, No. 1,511,015; Evans, No. 1,736,852; and Falknor, No. 1,698,014.

With the exception of Falknor, they all utilize a direct current potential obtained from the output electrode, which rectifies to produce the direct current potential, to affect the grid electrode of an associated amplifier to effect automatic volume control.

In Friis, No. 1,675,848, two tubes are employed; one tube being the detector tube of Wheeler, and the other tube being the AVC rectifier, not being used as a relay to pass on the signal current to the loud speaker, but having as its sole function the effecting of automatic volume control, as distinguished from the double function detector of the Wheeler patent in suit.

This is likewise true of the AVC rectifier tube R of the Affel patent, No. 1,511,015.

In Friis, No. 1,675,848, Affel, No. 1,511,015, and Evans, No. 1,736,852, the AVC rectifier tube contains and separately utilizes more than two electrodes, as distinguished from the diode detector tube of the patent in suit.

The Wheeler patent is confined to the differences that exist in its own arrangement and instrumentalities and those disclosed by the patents cited as references during its prosecution, which we have been considering, all of which accomplish the identical result of the Wheeler patent in suit; that is, automatic volume control. The patent having issued over these references, the construction of the claims must be limited by them.

We will now consider prior art in evidence that was not cited during the prosecution of the application for the patent.

Patent No. 1,574,780, issued to Affel, for means for and method of modulation, granted March 2, 1926, on an application filed October 5, 1921, conceded to be prior art. This patent is directed to effecting automatic volume control. For the purpose of illustrating the fundamental principle utilized, I refer to claim 2, which it seems to me recites the identical fundamental principle on which the alleged invention of the patent in suit is based:

"2. The method of controlling the amplification of a vacuum tube amplifier which consists in rectifying a portion of the input energy and applying the direct current component of the rectified energy to the grid circuit of the tube to determine the static potential thereof."

All of the alleged infringing tubes were licensed under this patent and claim.

Fig. 1 shows an amplifier tube AT, associated with an AVC rectifier tube RT. The anode or output electrode of the rectifier RT is normally negative to the filament of the amplifier AT, by reason of the resistance 4. This resistance is the Wheeler resistance 51, Fig. 1.

The anode or output electrode of the AVC rectifier RT becomes increasingly negative in the presence of an amplified signal, by reason of the resistance 4. There is a direct connection from the anode of the AVC rectifier to the grid or input circuit of the amplifier AT. This connection is employed for the purpose of controlling the amplification of the amplifier tube to effect automatic volume control.

Defendant's reliance is on Fig. 1, the only circuit diagram. Lines 58 to 67, on page 2 of the patent, is for an assumed case for the purpose of explaining Fig. 3.

Affel seems to me to meet the witness Langley's three points. Fig. 1 of Affel shows automatic volume control with the negative bias, the other figures show it with positive bias. That automatic volume control is equally well controlled by the grid becoming either increasingly positive or increasingly negative with increased signal seems to me to be shown by the specification, page 2, lines 1–16; and page 2, lines 39–42.

Automatic volume control is effected by changing the potential on the grid electrode of the amplifier, and the AVC connection is the same, and functions the same, whether the potential on the grid is made increasingly positive or increasingly negative.

The claims of the patent in suit, however, are different. They relate to maintaining the plate electrode of the rectifier negative relative to the filament of the amplifier, and in utilizing rectified current derived from the output circuit of the rectifier to change the potential of the grid of the amplifier.

I observe two differences between the Wheeler patent and Affel patent, No. 1,574,-780—first, that the patent in suit employs as a detector in Fig. 1 a triode or three-electrode tube connected and used as a diode; second, that the AVC rectifier tube RT of Affel does not act in the double capacity of effecting automatic volume control and serving as a relay to pass on to succeeding stages the current that passes through it.

Patent No. 1,687,245, issued to Heising, for amplifying, granted October 9, 1928, on application filed December 30, 1922. It shows a system comprising a series of amplifiers, in the approximate center of which is located a two-electrode AVC rectifier 11. The plate electrode of the rectifier is maintained negative relative to the filament of the succeeding amplifiers into which it feeds by means of resistances 12 and 13, which correspond to Wheeler resistance 51. The plate electrode of the rectifier becomes increasingly negative in the presence of an amplified signal, because of these resistances. The plate electrode of the rectifier is directly connected to the grid electrode of all three of the succeeding amplifiers.

The automatic volume control of the Heising patent, No. 1,687,245, is applied to a transmission system, but automatic volume control is the same whether it is used for transmission or reception, and operates on the same principle and with the same circuit and instrumentalities.

The claims of the patent in suit were drawn broadly to include any signaling system. For effecting automatic volume control, it is immaterial whether the control be effected on the input or grid electrode of an amplifier which precedes or succeeds the AVC rectifier.

The claims of the patent in suit were drawn broadly enough to include either arrangement.

The Heising patent points out that the reason why the automatic volume control is not applied to the grid electrode of the two three-electrode amplifiers which precede the detector system is because "the power consumption in the amplifiers 7 and 8 is too small to necessitate the application of the invention to their input circuits."

I find the following differences between the Heising patent and the Wheeler patent in suit: The AVC rectifier employed by Heising is a two-electrode tube or diode used as a diode. The patent in suit employs a three-electrode tube or triode, which performs two distinct and separate detecting functions, one for automatic volume control, and the other for changing the radio frequency currents into audio frequency currents.

The only arrangement described in the specification of the patent in suit, for maintaining the plate or output electrode of the detector negative relative to the cathode of its controlled amplifier (other than by a separate battery employed for that purpose), is the expedient of connecting the filaments of the vacuum tubes in series, as illustrated in Fig. 6 of the patent in suit. The fundamental principle of automatic volume control, upon which plaintiff predicates the invention of the patent in suit, is claimed in the Heising patent, in claim 4, as follows:

"4. The method of repeating a high frequency wave of variable amplitude by means of a space discharge device which comprises rectifying a portion of the high frequency wave energy by means of a device other than the space discharge device and applying to the space discharge device a potential difference resulting from the rectification to control the repetition of the high frequency waves by the space discharge device."

All three of the alleged infringing receivers herein were licensed under this patent and claim to utilize the invention there defined.

Patent No. 1,666,676, issued to Bjornson, for repeater circuits, on an application filed June 27, 1928, shows and describes a circuit effecting automatic volume control which is, in so far as we are concerned, substantially the

same as that shown in Affel patent, No. 1,574,780, with the addition of a negative biasing battery, to make the detector anode negative with respect to the amplifier cathode.

The same expedient is shown in the patent in suit in Fig. 4, wherein a battery for this purpose is indicated at 45.

In the Bjornson patent, as in the Affel patent, an AVC rectifier 7 is employed, the plate or output electrode of which is maintained negative relative to the cathode of the amplifier 2, by means of the resistance 9, which corresponds to resistance 51 of Fig. 1 of the patent in suit. Because of that resistance, the anode becomes increasingly negative in the presence of an amplified signal. The plate electrode of the rectifier 7 is provided with a direct electrical connection to the grid electrode 3 of the amplifier 2.

The Bjornson patent employs only audio frequency currents, but this is wholly immaterial to the subject of automatic volume control, which is just as desirable for audio frequency as for radio frequency currents, and is effected by the identical circuit and instrumentalities.

The claims of the patent in suit are not limited to any particular frequencies.

The disclosure of the Bjornson patent differs from that of the patent in suit only in that in Bjornson a three-electrode rectifier, used as such, is employed, and it functions solely for the purpose of effecting automatic volume control, and not for that purpose in conjunction with serving as a relay, as in the patent in suit.

Plaintiff contends that the Heising and Bjornson patents are not prior art, but I cannot agree with that contention. The date of filing their applications definitely antedates Wheeler, and fixes the date of their inventions, and those patents illustrate what had been invented by others than Wheeler, and before him. Milburn Co. v. Davis, etc., Co., 270 U. S. 390, 46 S. Ct. 324, 70 L. Ed. 651.

The only difference I can find between the disclosure of the patent in suit and the disclosure of the three patents last above discussed (particularly with reference to Fig. 1 of the patent in suit) is that the patent in suit employs a single triode connected as a diode, to serve the double function of acting as a relay to pass on the current to the succeeding stages from the output electrode thereof, and for the purpose of effecting automatic volume control.

The advantages that flow from such an arrangement are specifically pointed out and emphasized in the patent in suit, and the wording of the claims is entirely consistent with this single difference that exists between the disclosure of the patent in suit and the prior art, and the claims of the patent in suit, on which this suit is based, must be construed as limited by the prior art.

Claim 1 of the patent in suit is directed to a signaling system comprising (1) a vacuum tube amplifier having a cathode and a control electrode; (2) a vacuum tube detector coupled to said amplifier; (3) said detector having an output electrode; (4) means for maintaining said output electrode normally negative relative to at least part of said amplifier cathode; (5) means for causing the output electrode to become more negative in the presence of an amplified signal, and a direct current connection between said control electrode and said output electrode, whereby the amplification of said amplifier is regulated automatically.

Claim 5 describes the detector as having an output electrode, in the identical language of claim 1, but whereas in claim 1 the detector is described as a "vacuum tube detector," in claim 5 the detector is not described as a vacuum tube.

Claim 6 differs from claims 1 and 5 only in reciting the detector as "a second vacuum tube."

Claim 10 differs from claim 1 only in reciting the detector as "a diode detector."

All of the claims are expressly limited to a detector tube having an output electrode which is directly connected to the grid or input electrode of an associated amplifier tube.

If the "detector tube" be continued as a triode connected as a diode, and performing the double function of effecting automatic volume control and serving as a relay, and those are the only features which distinguish the disclosure of the patent in suit from the prior art illustrated by Affel, No. 1,574,780, Heising, and Bjornson, then the alleged invention of the patent in suit, as thus defined, is not employed in any of the receivers alleged to infringe herein.

Let us now consider the Kolster receiver involved in the first suit, the Zenith receiver of the consent decree, and then the three alleged infringing receivers herein.

The Kolster receiver used as a detector tube a triode connected as a diode, that is, the detector tube had its plate and grid electrodes connected together so that they formed both the input and output electrode. The tube also served the double function of effecting

106

automatic volume control, and of relaying the current passing through it to succeeding stages of the system. The direct connection to the control grid of the amplifier tube is made from the output electrode of the detector tube.

Considered, with reference to this case, the Kolster receiver is, structurally as well as in circuit, substantially the same as Fig. 1 of the patent in suit, and differs from the prior art in the same particulars as Fig. 1 of the patent in suit.

The circuit diagram of the Zenith receiver, put in evidence herein, in so far as automatic volume is concerned, is substantially identical with the Kolster receiver, and like Kolster employs a three-electrode detector, the grid and plate electrodes of which are connected together to form a diode, which performs the double function of serving as a relay, and automatically effecting volume control.

In Wheeler, Kolster, and Zenith, the output electrode of the detector is directly connected to the controlled grid of the amplifier.

This arrangement is undesirable from the point of view of flexibility and ease of control, because the detector output electrode is fixed as to potential, with respect to the grid electrode of the amplified tube. In the art prior to Wheeler, it was common to use a separate detector for the AVC circuit (Affel, Bjornson, Friis, etc.), but Wheeler, as he pointed out in distinguishing over the prior art, preferred to use one electrode for both his audio frequency output, and also his AVC circuit, thereby obtaining a "great saving of circuit elements."

The three alleged infringing receivers employ the arrangement of the prior art, using two different electrodes, or the equivalent of two different electrodes, obtaining a flexibility and freedom from complication which Wheeler, in his more involved system, did not have.

The Bosch receiver does not employ Wheeler's 201A type triode tube, the cold electrodes of which are connected as a diode, and which detector tube serves the double function of relaying the current to succeeding stages and effecting automatic volume control. Quite to the contrary, Bosch employs two separate tubes of the 227 type, with the plate electrode of each tube connected to its filament electrode. The upper tube on the circuit diagram is a detector, to produce audio frequency currents, and serves exclusively as the relay. The lower tube on the circuit diagram is the AVC rectifier, and serves exclusively for effecting automatic volume control.

It follows that the output circuit of the detector, which relays the current passing through it to the succeeding stages, is not connected to any amplifier for controlling the degree of amplification. The Bosch receiver follows the arrangement of the prior art in this respect. The point of difference of the patent in suit over Friis, No. 1,675,848, and Affel, No. 1,511,015, cited by the Patent Office, is not employed by the Bosch receiver, but the Bosch receiver closely follows the prior art patents under which its manufacture is licensed. Further, the output electrode of the tube which serves exclusively as a relay is not negative relative to the filament of the amplifier, as required by the claims of the patent in suit.

The Colonial receiver does not use two separate tubes, as does the Bosch receiver, but the Colonial combines two tubes in a single glass envelop. Each Bosch tube has a cathode, grid, and anode. In the Colonial type 75 tube there is a single cathode, a single grid, and two different anodes. The cathode, grid, and one anode constitute one tube in effect (either a detector or an amplifier). The cathode and the other anode constitute the AVC tube which supplies the current to the amplifier grids to be controlled.

No triode connected as a diode is employed by the Colonial, nor are the anodes which is the output electrode, and its output circuit connected to the grid electrode of the controlled amplifier, nor have they anything to do with it. Neither is it negative with respect to the filament of the amplifier.

The RCA-Victor receiver does not employ a 201A triode detector with the plate and grid electrodes connected together as a diode, as does the patent in suit, but the RCA-Victor receiver employs a duplex diode pentode type 6B7, an entirely different type of tube. The only output electrode of the tube, that is, the electrode which relays the current handled by the tube to the succeeding stages of the system, has no direct connection between it or its output circuit, and any amplifying tube to be controlled thereby. Its potential is not negative with respect to the cathode of the controlled amplifier.

Plaintiff contends that the output electrode of the tube is the two diode electrodes, which are connected together, and from which there is a direct connection to the grid electrode of a controlled amplifier. This contention I find to be erroneous, as I am convinced that this anode electrode (or the two of them connected together) is not the electrode of the tube as defined in the claims of the patent

in suit; neither is it an output electrode of the tube. In the RCA-Victor circuit this anode is connected to a grid electrode in the same tube, and, while it is immaterial whether that connection is exterior or interior of the tube, the point is that by being connected to a grid electrode, in the same tube, there is a closed circuit between them for circulating the current in the tube itself, and no output in the standard terminology of the art, or in the sense in which the term is used in the patent, is present or capable of being present. The very limited contribution of the patent in suit to the art is not found in the RCA-Victor receiver.

In the Bosch, Colonial, and RCA-Victor receivers, automatic volume control is effected by a wholly separate set of instrumentalities. In the Bosch receiver, AVC is obtained by employing two separate glass envelops, while in the Colonial and RCA-Victor receivers, it is in effect obtained by separate tubes, although the two tubes in each of these receivers are included in a single glass envelop.

In no one of the three receivers alleged to infringe is there employed a triode used as a diode, the output electrode of which is negative in potential, and serves the double purpose of relaying the current passed through the tube to the succeeding stages of the system, and of effecting automatic volume control.

As we have seen from our consideration of the prior art, Wheeler's sole contribution to the art was teaching the use of a single three-electrode vacuum tube detector, the two cold electrodes (grid and plate) of which are connected together to form an output electrode of a diode detector, and which serves the double function of relaying the signal current to the succeeding stages of the system, and, by means of a direct connection to an associated amplifier, effecting automatic volume control by controlling the degree of amplification of the amplifier.

The claims of the patent in suit, on which this suit is based, are by their language limited to an arrangement which employs a detector relay, the output electrode of which is normally negative, and is provided with that connection.

As I stated before, the claims in suit are not for a pioneer contribution to the art, but are narrow in scope and do not deserve a broad interpretation. Duplex Electric Co. v. Padua Hold-up Alarm Corporation (C. C. A.) 30 F.(2d) 344, 345.

None of the alleged infringing receivers herein, Bosch, Colonial, or RCA-Victor, employs the contribution to the art of Wheeler, described supra, but differ radically from the disclosure and claims of the Wheeler patent.

The receivers alleged to infringe herein accomplish the same result as that of the patent in suit, namely, they effect automatic volume control.

That was not new with Wheeler, and the most that he can claim is that he devised a specifically new way of accomplishing an old result.

I find no similarity between the patent in suit and the alleged infringing receivers, except identity of result.

The patent in suit, not being a pioneer patent, but a narrow one, is entitled only to such range of equivalents as are necessary to protect the invention of the patent in suit, and none of the alleged infringing receivers employs any such equivalents.

Identity of result alone is not the test for infringement, nor is it sufficient that the claims of the patent read literally on the receivers alleged to infringe. Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136; National Electric S. Co. v. Telefunken Wireless Tel. Co. (D. C.) 209 F. 856, 857.

The specified claims of the patent in suit do not even read literally on the receivers alleged to infringe, which differ radically from such claims and the disclosure of the patent in suit, and such receivers do not infringe the patent in suit.

Defendant is entitled to a decree against the plaintiff dismissing the complaint on the merits, with costs. Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided by rule 70½ of the Rules in Equity (28 USCA § 723) and equity rule 11 of this court.